IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| TROY MICHAEL KELL,<br>Petitioner,<br>v.<br>SCOTT CROWTHER,<br>WARDEN, UTAH STATE PRISON,<br>Respondent. | **AMENDED MEMORANDUM DECISION AND ORDER**<br><br>No. 2:07-CV-00359-HCN<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Petitioner Troy Michael Kell brings this federal habeas corpus petition under 28 U.S.C. § 2254, challenging his state-court conviction and sentence of death. He asserts numerous claims under the United States Constitution. The court denies the petition.

**I.**

Troy Michael Kell committed his first murder in Nevada. He was sentenced to life imprisonment without the possibility of parole. *See* X5051, 5132; XIII5625–26.[1] In June 1993, Mr. Kell was transferred from Nevada to the Utah State Prison. *See* VII4588; X5073–74. In March 1994, he was transferred to the Central Utah Correctional Facility (CUCF) in Gunnison,

[1] There are eight pleadings files from the underlying criminal case, which the court will cite as "KIR." There are approximately forty-seven transcript volumes in the criminal file. The district court clerk assigned individual record numbers to all the transcript pages, but they are not numbered chronologically. The court will refer to the criminal-case pretrial transcripts as "Tr." The court will refer to the criminal trial transcripts by their Roman numeral, *e.g.*, "IX4882." The court will refer to the post-conviction record as "KIIR." Finally, the court will refer to the record of the trial proceedings as they were submitted to the state appellate courts as "ROA."

Utah, where he was involved in race-related altercations with several African American inmates, including Lonnie Blackmon. *See State v. Kell* (*Kell I*), 61 P.3d 1019, 1024–25 (Utah 2002).

On July 6, 1994, Mr. Kell and two accomplices, Eric Daniels and Paul Payne, submitted medical requests to visit the infirmary. Mr. Daniels also forged a request to have Lonnie Blackmon transported to the infirmary with them. *See id.* During the transport, Mr. Kell—using a key made from melted plastic utensils—removed his own handcuffs. He then produced a shank and began to stab Mr. Blackmon, who was still handcuffed. Mr. Kell stabbed Mr. Blackmon repeatedly in the chest, back, neck, face, and eyes while Mr. Daniels and Mr. Payne restrained Mr. Blackmon. Mr. Kell twice walked away and then returned to resume the attack. *See id*. at 1025. When Mr. Blackmon finally lay motionless on the cell block floor, Mr. Kell strutted around the room, yelling "White Power" and "[I've] been killin' n*****s ever since [I] was an itty-bitty Aryan." XI5307; State's trial exhibit 3.[2]

The medical examiner counted sixty-seven stab wounds, most of which were not lethal, including twenty-six on Mr. Blackmon's face and chin, twenty-seven on his neck, and nine on his eyes. The medical examiner believed that a stab wound under Mr. Blackmon's right ear severed his carotid artery, causing his death. *See* IX4870, 4879–89.

The entire murder was captured on video. *See Kell I*, 61 P.3d at 1030.

**II.**

The State charged Mr. Kell with capital murder. After holding two pretrial evidentiary hearings, the trial court decided to hold the trial in a courtroom located inside the CUCF. *See id.* at 1025. The court considered several factors in making this decision, including Mr. Kell's

---

[2] State's trial exhibit 3 is a video of the murder. The State included it as exhibit 14 to its response to Mr. Kell's petition. *See* Dkt. No. 107

criminal background, prison disciplinary record, and overall prison history; several logistical problems related to security in either of the other available courthouses; and the fact that most of the witnesses would be prison guards or high-security inmates. *See id.*

At trial, Mr. Kell testified that he killed Mr. Blackmon because he believed certain statements he had overheard Mr. Blackmon making amounted to threats directed at Mr. Kell, even though Mr. Blackmon made no threatening gestures toward him on the day of the murder. *See id.* After hearing evidence and viewing the videotape, the jury found Mr. Kell guilty of capital murder and recommended a death sentence, and the court accordingly sentenced him to death. *See id*. He appealed, and the Utah Supreme Court affirmed the conviction and sentence. *See id.* at 1038.

In May 2003, Mr. Kell filed a preliminary petition for post-conviction relief under Utah's Postconviction Remedies Act (PCRA), challenging his conviction and sentence. *See Kell v. State* (*Kell II*), 194 P.3d 913, 916 (Utah 2008). In August 2005 he filed an Amended Petition in which he raised various claims related to the jury selection process, the fairness of the trial proceedings, and the effectiveness of his representation at trial and on appeal. *See id.* at 916–17. The post-conviction court entered summary judgment in favor of the State on all of these claims. *See id.* at 917. The Utah Supreme Court affirmed. *See id.* at 925.

Mr. Kell next moved to set aside the post-conviction judgment against him under Utah Rule of Civil Procedure 60(b), claiming his post-conviction counsel had been ineffective. The state district court denied Mr. Kell's motion. *See* KIIR 2979–95. The Utah Supreme Court affirmed, holding that Mr. Kell could not use Rule 60(b) to circumvent the PCRA's limits on successive state post-conviction petitions that would otherwise bar relief. *See Kell v. State* (*Kell III*), 285 P.3d 1133, 1140 (Utah 2012).

Mr. Kell requested that this court appoint counsel to prepare a petition for a writ of habeas corpus under 28 U.S.C. § 2254 on May 31, 2007, while his first state post-conviction case was still pending. *See* Dkt. No. 1. The court appointed counsel, and Mr. Kell filed his federal habeas petition on May 27, 2009. *See* Dkt. Nos. 3, 36. On October 8, 2009, this court stayed the federal proceedings while Mr. Kell litigated his Rule 60(b) motion in state court. *See* Dkt. No. 51. After the Utah Supreme Court affirmed the denial of the Rule 60(b) motion, Mr. Kell filed the amended petition now before the court on January 14, 2013. *See* Dkt. No. 94.

Following the completion of litigation regarding discovery and evidentiary development, this court held oral argument on the merits of Mr. Kell's amended petition on August 11, 2017. After oral argument, Mr. Kell filed a motion under *Rhines v. Weber*, 544 U.S. 269 (2005), asking the court to stay the federal habeas proceedings while he returned to state court to attempt to exhaust Claims Three (D) and Three (F), both of which he raised for the first time in his Amended Petition. *See* Dkt. No. 245. The court granted the motion with respect to Claim Three (F) but denied it with respect to Claim Three (D). *See* Dkt. No. 258.

In 2018, Mr. Kell accordingly filed a state postconviction petition seeking to exhaust Claim Three (F). The state district court denied the petition, ruling that the claim was procedurally barred under the PCRA as untimely and as an improper successive post-conviction petition. The Utah Supreme Court affirmed the denial on December 21, 2023. *See Kell v. State* (*Kell IV*), 541 P.3d 940, 949 (Utah 2023).

Following the Utah Supreme Court's decision, this court lifted the *Rhines* stay and allowed Mr. Kell to "amend Claim 3(F) to the extent that any significant legal changes have transpired since the currently operative petition was filed." Dkt. No. 321 at 5. Mr. Kell then filed

Amended Claim Three (F). *See* Dkt. No. 324. The amended claim is now fully briefed. *See* Dkt. Nos. 325, 330, 334.[3]

**III.**

Before addressing the balance of the amended petition, the court will consider Amended Claim Three (F), which is based on Mr. Kell's allegation that "the trial court committed procedural error when it gave an unconstitutional supplemental jury instruction outside the presence of Kell and his counsel." *Kell IV*, 541 P.3d at 943. Mr. Kell alleges that this instruction unconstitutionally shifted the burden of proof to him for the penalty phase.

When Mr. Kell attempted to exhaust this claim in state court, the trial court granted summary judgment for the State. The Utah Supreme Court affirmed. It observed that Mr. Kell did not raise this issue in state court until 2018, even though he "discovered" the "evidence" that formed its "root . . . in 2012." *Id.* at 945. The court held that Mr. Kell's claim was thus time-barred under the PCRA. *See id.*[4] It further concluded that Mr. Kell had failed to offer any valid justification for the delay—and specifically had failed to show that "any shortcoming of his initial post-conviction counsel excuse[d]" it. *Id.* As that court put it, Mr. Kell could not "wait more than five years after receiving actual knowledge of the evidence supporting his petition to pursue relief and then ask [the court] to excuse the lapsing of the time bar based on the performance of counsel who ceased representing him years before the discovery of the relevant evidence." *Id.* Finally, although the court noted that it had previously recognized the existence of

[3] Shortly after the ruling in *Kell IV*, this case was transferred to the undersigned from the judge who had previously presided over the case, including the oral argument on the petition. The undersigned has carefully reviewed the official transcript of the hearing as well as the parties' briefing on the merits of the amended petition.

[4] The court also discussed the PCRA's bar of successive postconviction petitions, Utah Code Ann. § 78B-9-106(1)(d); it is not clear that the court independently relied on that bar in reaching its decision, however. *See Kell IV*, 541 P.3d at 945.

what it called a "safety valve" that allows Utah courts to "hear a claim even if it is barred under the PCRA when failure to do so would violate a petitioner's constitutional rights," *id.* at 947–48 (cleaned up), the court concluded this safety valve did not apply to Mr. Kell's claim because he failed to "show[] that the time and procedural bars left him unable to vindicate his substantive rights" or otherwise "violate[d] his . . . rights" under the Utah Constitution, *id.* at 949.

"Ordinarily, a state prisoner seeking federal habeas relief must first 'exhaust the remedies available in the courts of the State,' 28 U.S.C. § 2254(b)(1)(A), thereby affording those courts the first opportunity to address and correct alleged violations of the prisoner's federal rights." *Walker v. Martin*, 562 U.S. 307, 315–16 (2011) (cleaned up). "Accordingly, absent showings of 'cause' and 'prejudice,' federal habeas relief will be unavailable when (1) a state court has declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." *Id.* at 316 (cleaned up).

The court concludes that it cannot consider Claim Three (F) because the Utah Supreme Court's holding that it is procedurally barred "rests on independent and adequate state procedural grounds" and Mr. Kell has failed to show cause that would excuse his default. *Id.* (cleaned up).

**A.**

The court first considers whether the time bar on which the Utah Supreme Court relied is independent. A state procedural ground is independent if it "relies on state law, rather than federal law, as the basis for the decision." *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998). If the procedural bar "does not require" or "rest[] on" "a federal constitutional ruling on the merits," then it is independent. *Stewart v. Smith*, 536 U.S. 856, 860 (2002).

The time bar at issue here arises from a state statute, the PCRA, which requires postconviction petitioners to submit each of their claims for relief to the state courts "within one year after the day on which the cause of action has accrued." Utah Code Ann. § 78B-9-107(1). Claims based on new evidence accrue on "the date on which petitioner knew or should have known, in the exercise of reasonable diligence, of evidentiary facts on which the petition is based." *Id.* § 78B-9-107(2)(e). There can be no question that the meaning and application of these statutory provisions themselves present issues solely of state law. Indeed, Mr. Kell does not appear to argue otherwise.

Rather, Mr. Kell maintains that the application of these statutory provisions is nonetheless "interwoven with federal law" because, he asserts, the Utah courts might excuse an untimely claim under the safety valve recognized by the Utah Supreme Court if application of the time bar would violate a petitioner's federal constitutional rights. Dkt. No. 330 at 21. This argument is not well taken.

In concluding that the "safety valve" it had previously recognized did not apply to Mr. Kell's case, the Utah Supreme Court considered only whether applying the PCRA time bar to deny Mr. Kell relief would violate his rights "under the Suspension Clause, Due Process Clause, and Open Courts Clause of the Utah Constitution"—all plainly questions of state law. *Kell IV*, 541 P.3d at 946. Nowhere did the court suggest that any federal constitutional considerations could justify application of the safety valve.

In reaching this conclusion, moreover, the Utah Supreme Court relied on its earlier decision in *Patterson v. State*, which addressed the existence and scope of exceptions to the PCRA's time bar at length. *See* 504 P.3d 92, 134 (Utah 2021). The court in that case clarified that Utah courts lack power to hear a time-barred claim for "good cause," *id.* at 131, or to

prevent an "egregious injustice," *id.* at 134. Rather, the court in *Patterson* held that the Utah courts "can only hear a time-barred case . . . when failure to do so would violate a petitioner's constitutional rights." *Id.*

But although that sentence in isolation might seem ambiguous, the rest of the opinion leaves no doubt that the *Patterson* court considered only Utah constitutional violations as potential bases for applying the safety valve. The court discussed at length the "privilege of the writ of habeas corpus" secured by the Utah Constitution. *Id.* at 136. It explained that before the PCRA was enacted, the court had applied "judicially created procedural bars and associated exceptions" and that, even after the PCRA was enacted, it had characterized a good-cause exception to the PCRA's procedural requirements as an "exercise of [the court's] constitutional authority that existed independent of the PCRA and its exceptions." *Id*. at 131.

In 2008, however, the Utah "Legislature amended the PCRA to state that it was the 'sole legal remedy' for a post-appeal challenge to a conviction or sentence." *Id*. at 132. And the following year, the Utah Supreme Court promulgated Utah Rule of Civil Procedure 65C, which provides that the PCRA "sets forth the manner and extent to which a person may challenge the legality of a criminal conviction and sentence after the conviction and sentence have been affirmed in a direct appeal under Article 1, Section 12 of the Utah Constitution, or the time to files such an appeal has expired," Utah R. Civ. P. 65C(a)—thus "incorporat[ing] the PCRA as the sole legal remedy for post-conviction petitions," *Patterson*, 504 P.3d at 132 (cleaned up).

In light of the amendment to the PCRA and Rule 65C, the court explained that the "question" it faced was "not whether there is a pre-PCRA exception that we can apply to save a time-barred petition. We eliminated any such exception when we adopted rule 65C." *Id*. at 134. "Nor [was] the question whether there is some new 'egregious injustice' exception that we might

define and apply in an appropriate case." *Id*. Rather, the court made clear that "[t]he real question" it was addressing was

> whether application of the procedural bars found in the PCRA and rule 65C violate a petitioner's constitutional right to avail herself of the writ the Utah Constitution guarantees. In other words, are the bars and exceptions we borrowed from the PCRA and adopted in rule 65C so narrow that without some sort of additional exception like those we had previously recognized, rule 65C and the PCRA violate a petitioner's constitutional rights?

*Id*.

The *Patterson* court then considered and rejected contentions that application of the PCRA time bar violated "the Open Courts Clause of the Utah Constitution" or "the Suspension Clause of the Utah Constitution." *Id.* With respect to the latter challenge, the court explained:

> Simply stated, Patterson has not convinced us that the flexible one-year statute of limitations to file a post-conviction writ amounts to a suspension of the writ of habeas corpus. But we leave open the possibility that another petitioner, on another set of facts, might be able to demonstrate that the application of the time bars in the PCRA and rule 65C run afoul of the Suspension Clause, or some other provision, of the Utah Constitution.

*Id.* at 137. Against this backdrop, the court has little difficulty concluding that the safety valve recognized in *Patterson* and *Kell IV* is concerned primarily with claims involving the Suspension Clause and related provisions of the Utah Constitution and extends at most to other potential violations of the Utah Constitution. It follows that applicability of the time bar is independent from, not intertwined with, federal law.[5]

---

[5] The court's understanding of the scope of the safety valve is also consistent with the order requesting supplemental briefing issued by the Utah Supreme Court before its ruling in *Kell IV*. *See* Supp. Br. Order, *Kell v. State*, No. 20180788 (Utah Jan. 31, 2022). In that order, the court explained that it had "recently determined in *Patterson v. State*" that "there is no egregious injustice exception, and [it] can only hear a case otherwise barred by the PCRA 'when failure to do so would violate a petitioner's constitutional rights.'" *Id*. It thus requested briefing on whether "affirming the dismissal of Mr. Kell's petition would violate his rights *under the Utah Constitution*." *Id*. (emphasis added). And even Mr. Kell apparently did not believe that any

**B.**

As for adequacy, the relevant question is "whether the state rule . . . was firmly established and regularly followed" when the state court invoked it to deny relief. *Beard v. Kindler*, 558 U.S. 53, 60 (2009) (cleaned up).

There is little doubt that the PCRA's time bar was firmly established long before Mr. Kell first became aware of the grounds for his late-breaking claim. Indeed, the time bar has been in force since 1996, when the Utah Legislature first adopted the PCRA. *See* Post-Conviction Remedies Act, H.B. 214, 1996 Leg., Gen. Sess. (Utah 1996) (codified as amended at Utah Code Ann. §§ 78B-9-101–503). The original Act provided a preclusive one-year statute of limitations. *See id.* §§ 6–7 (codified as amended at Utah Code Ann. §§ 78B-9-106(1)(e), -107). The 1996 statute of limitations provision did contain an "interests of justice" exception that could excuse untimely filing. *See id.* § 7(3). But in 2008, the Legislature removed the interests-of-justice exception, replacing it with tolling provisions. *See Noor v. State*, 435 P.3d 221, 229 (Utah 2019) (citing Utah Code Ann. § 78B-9-107(3) (2016)). As already discussed, the 2008 amendment also provided that the PCRA was the "sole legal remedy" for post-conviction petitions and, in 2009, the Utah Supreme Court incorporated this limitation in Rule 65C. *See Patterson*, 504 P.3d at 132. All of these changes were well established by the time Mr. Kell became aware of facts and circumstances on which Claim Three (F) is based.

There is also ample caselaw demonstrating that Utah courts have "regularly" and "evenhandedly" applied the time bar, including any safety valve or exceptions. *Fairchild v. Workman,* 579 F.3d 1134, 1141 (10th Cir. 2009); *see, e.g.*, *Kell IV*, 541 P.3d at 944, 949;

---

federal constitutional question was intertwined with the time bar's application, because he does not appear to have invoked any provision of the federal Constitution in connection with his argument that the safety valve should apply to his claim.

*Patterson*, 504 P.3d at 102, 138 (remanding two claims for consideration of whether they were timely based on asserted newly discovered evidence); *Carter v. State*, 439 P.3d 616, 640 (Utah 2019) (improper vouching claims barred as untimely); *Winward v. State*, 293 P.3d 259, 267–69 (Utah 2012) (all but one claim barred as untimely; remanding for consideration of whether one claim had been timely raised in light of the then-new *Lafler v. Cooper* opinion); *Gardner v. State*, 234 P.3d 1115, 1142–44 (Utah 2010) (*Lackey* claim barred as untimely); *Carrell v. State*, 536 P.3d 653, 665 (Utah Ct. App. 2023) (jury instruction claims barred as untimely), *cert. denied*, 540 P.3d 81 (Utah 2023); *Marchet v. State*, 367 P.3d 1050, 1051 (Utah Ct. App. 2016) (second petition barred as untimely); *Williams v. State*, 362 P.3d 743, 744 (Utah Ct. App. 2015) (petition barred as untimely); *Brown v. State*, 361 P.3d 124, 129 (Utah Ct. App. 2015) (same); *Collum v. State*, 360 P.3d 13, 15 (Utah Ct. App. 2015) (same); *Cunningham v. State*, 294 P.3d 588, 590 (Utah Ct. App. 2012) (same); *Tillman v. State*, 288 P.3d 318, 322 (Utah Ct. App. 2012) (notice claim barred as untimely); *Weikert v. State*, 275 P.3d 1088, 1089 (Utah Ct. App. 2012) (petition barred as untimely).

To be sure, Mr. Kell argues that, over the years, there has been a "legal shift"—not regarding the PCRA's time bar itself, but regarding the *exception* to that bar. Specifically, he contends that "[t]he *Patterson* decision effectively created a new, non-statutory exception to the PCRA's procedural bars." Dkt. No. 324 at 6.

As evidence of this legal change, Mr. Kell first cites *Gardner v. State,* 234 P.3d 1115, 1147 (Utah 2010), in which the Utah Supreme Court held that a post-conviction petitioner's claims were time-barred under the PCRA. Mr. Kell argues that the *Gardner* court "hinted" that it might have the authority, in some circumstances, to consider the merits of claims otherwise barred by the PCRA to remedy an egregious injustice. Dkt. No. 330 at 14. The court chose not to

address the issue, however, because the exception would not have applied in that case anyway. *See Gardner*, 234 P.3d at 1146.

Mr. Kell next cites *Winward v. State*, 293 P.3d 259, 264 (Utah 2012), in which he maintains that the Utah Supreme Court "articulate[d] a framework for considering a petitioner's claim that he qualifies for an exception to the PCRA's procedural bars." Dkt. No. 330 at 15. Mr. Kell represents that for nine years, he relied on *Winward* in support of merits review of Claim Three (F), arguing that it would work an "egregious injustice" not to consider this claim on the merits. *Id.* But *Winward* did not create such an exception; to the contrary, it declined to decide "the scope of any 'egregious injustice' exception to the PCRA." 293 P.3d at 266.

To be sure, while Claim Three (F) was still pending before the Utah Courts, the Utah Supreme Court decided *Patterson.* As already discussed, it there held that there is no egregious injustice exception to the time bar, thereby "mak[ing] explicit what *Gardner* intimated: under the current version of rule 65C, [the Utah Supreme Court] can only hear a time-barred case . . . when failure to do so would violate a petitioner's constitutional rights"—which, for the reasons previously explained at length, the court understands to refer to rights *under the Utah Constitution*. *Patterson*, 504 P.3d at 134. Mr. Kell maintains that the holding in *Patterson* departed from *Gardner* and *Winward* and thus created a "novel procedural rule" that was not firmly established or consistently applied at the time of his petition.

The court disagrees. For one thing, although the court hinted at the existence of an "egregious injustice" exception in *Gardner* and *Winward*, it did not actually hold that the exception existed, let alone rely on such an exception to review an untimely claim in either case. Indeed, Mr. Kell fails to identify any case where a Utah court has considered the merits of a

claim that is untimely under the PCRA based on an exception or safety valve—regardless of how that exception is formulated.

Further, the Utah Supreme Court's repudiation in *Patterson* of its suggestions in *Gardner* and *Winward* that there might be an egregious injustice exception to the time bar appears rooted in substantial part in the *2008* amendment to the PCRA and that court's corresponding adoption of Rule 65C, which established the PCRA as "the sole legal remedy for post-conviction relief" and thus "eliminated any" previously "existing judicially created procedural bars and associated exceptions." 504 P.3d at 130, 134 (cleaned up).

In light of all this, Mr. Kell can hardly argue that he could have reasonably relied on the application of any sort of exception to the statutory time bar and tolling provisions to his case even before the *Patterson* decision or that the state has "appl[ied] this exception in an irregular, arbitrary, or inconsistent manner." *Jimmy Swaggart Ministries v. Board of Equalization of Calif.*, 493 U.S. 378, 399 (1990).

In all events, "[a] state procedural bar may count as an adequate and independent ground for denying a federal habeas petition even if the state court had discretion to reach the merits despite the default." *Johnson v. Lee*, 578 U.S. 605, 610 (2016) (per curiam) (cleaned up). Whether or not *Patterson* eliminated any discretion Utah courts still had after 2008 to hear time-barred claims, the court thus concludes that this change did not impose "novel and unforeseeable requirements" on Mr. Kell "without fair or substantial support in prior state law." *Walker*, 562 U.S. at 320 (cleaned up). Mr. Kell thus fails to demonstrate that the PCRA time bar that the Utah Supreme Court invoked in refusing to review Claim Three (F) on the merits is not an adequate state-law procedural ground.

**C.**

If a state court's decision denying relief rests on an independent and adequate state ground, federal habeas relief is barred unless the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

"Cause excusing a procedural default must be some objective factor external to the habeas petitioner, not fairly attributable to him, that impeded his efforts to comply with the procedural rule in question." *Spears v. Mullin*, 343 F.3d 1215, 1255 (10th Cir. 2003). In declining to review Claim Three (F) on the merits, the Utah Supreme Court concluded that Mr. Kell "has not given a convincing reason for waiting over a year—indeed, over five years—after the discovery of the alleged violation to bring his current claim." *Kell IV*, 541 P.3d at 946. And it observed specifically that "[p]etitioners are, of course, not permitted to ignore a state statute of limitations simply because they are simultaneously proceeding on the claim in federal court." *Id.* at 948. This court agrees and accordingly concludes that Mr. Kell fails to show cause that would allow this court to review Claim Three (F). And because Mr. Kell has not shown cause, this court need not address whether he has shown actual prejudice.

**IV.**

Mr. Kell has asserted numerous other claims on which the court need not, or cannot, reach the merits. The court will next address these claims.

**A.**

Mr. Kell has withdrawn the following claims: Three (A), (B), and (C); Four; Seven; Ten; Thirteen (A) and (B); Fifteen (B), (C), (D), (H), (J), (M), and (O); Seventeen (F) and (J);

Eighteen; Twenty-One; and Twenty-Two (B), (E), and (F). *See* Dkt. No. 252 at 3. The court accordingly will not address these claims.

**B.**

This court ordinarily may consider on the merits only those claims that Mr. Kell exhausted in state court. To exhaust each claim, Mr. Kell was required to "'fairly present' [the] claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry,* 513 U.S. 364, 365–66 (1995)). And "if a petitioner 'failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred[,]' the claims are considered exhausted and procedurally defaulted for purposes of federal habeas relief." *Thomas v. Gibson,* 218 F.3d 1213, 1221 (10th Cir. 2000) (quoting *Coleman,* 501 U.S. at 735 n.1). It follows that so long as a state court now would reject such claims on an independent and adequate state ground, this court can consider the merits of the claims only if Mr. Kell can establish "cause for the default and prejudice from a violation of federal law." *Martinez v. Ryan*, 566 U.S. 1, 10 (2012).

Mr. Kell concedes that he never presented the following claims to the Utah Supreme Court: One (C); Eight; Nine; Eleven; Twelve; Thirteen (H) and (I); Fourteen; Fifteen (P); Sixteen; Twenty-two (G); Twenty-three; Twenty-four; Twenty-five (A), (B), (D), (E); Twenty-six; and Twenty-seven. *See* Dkt. No. 115. And for these claims, Mr. Kell does not dispute that the state courts would reject them now on independent and adequate state grounds. It is also undisputed that Mr. Kell has not submitted Claim Three (D) to the Utah Supreme Court. And although Mr. Kell does not concede that he failed to present the substance of claims Two and

Three (E) to the Utah Supreme Court, he does not identify anything in the record showing that he did and, despite careful review, this court has been unable to locate anything in the briefing Mr. Kell submitted to the Utah Supreme Court that fairly presented these claims to that court. *See* Dkt. Nos. 106-1, 106-2, 106-7, 106-10, 106-11. The court accordingly concludes that Mr. Kell failed to exhaust these claims.

The court is confident that were Mr. Kell to seek to assert any of these claims in state court now, they would be rejected on state procedural grounds. First, as already discussed, under the PCRA, Utah courts will not consider the merits of post-conviction claims not presented to them within one year from "the date on which petitioner knew or should have known, in the exercise of reasonable diligence, of evidentiary facts on which the petition is based." Utah Code Ann. § 78B-9-107(2)(e). Most of the claims that Mr. Kell never submitted to the Utah Supreme Court are based on facts known to him no later than when he filed his first state post-conviction petition in 2003. The only exception is Claim Three (D), which, like Claim Three (F), is based on evidence discovered by Mr. Kell's attorneys no later than 2012. It is clear from its decision in *Kell IV* that the Utah Supreme Court would find that all of these claims are foreclosed by the PCRA's time bar. And, for the reasons already explained in Part III, this court concludes that this time bar constitutes an independent and adequate state ground.

Second, the PCRA separately bars "relief . . . upon any ground that . . . was raised or addressed in any previous request for post-conviction relief or could have been, but was not, raised in a previous request for postconviction relief." Utah Code Ann. § 78B-9-106(1)(d). It is clear from the decision in *Kell III* that the Utah Supreme Court would also find all of the claims that Mr. Kell has not submitted in a previous petition barred because he could have raised them in his previous petition. The court has no difficulty concluding that the State's prohibition of

successive petitions is also an independent and adequate state ground. Indeed, courts in this district have repeatedly analyzed this procedural bar, reviewed Utah cases applying it, and concluded that it is independent and adequate.[6] The court agrees with those courts' analysis.

It follows that the claims that Mr. Kell never submitted to the state court are procedurally defaulted and that this court can consider them only if Mr. Kell shows cause and prejudice, a question the court will turn to in Part IV.D.[7]

**C.**

In addition to Claim Three (F), which the court has already addressed in Part III, the Utah Supreme Court rejected the following claims now pending before this court on state procedural grounds: Fifteen (A), (C), (E), (F), (G), (I), (K), (L), (N)[8]; Seventeen (A)–(E), (G), (H), (I), (K)–(N); Twenty-two (A), (C), (D); and Thirty. So long as the state procedural bar on which the Utah Supreme Court rejected these claims qualifies as "an independent and adequate state procedural

---

[6] *See Perea v. Benzon*, No. 2:19-CV-408 DAK, 2023 WL 2600139, at *4 (D. Utah Mar. 22, 2023); *Marchet v. Benzon*, No. 2:19-CV-394 TS, 2022 WL 4549012, at *6 (D. Utah Sept. 29, 2022); *Prater v. Haddon*, No. 2:21-CV-184 DAK, 2022 WL 671208, at *2 (D. Utah Mar. 7, 2022), *certificate of appealability denied sub nom; Prater v. Blood,* No. 22-4024, 2022 WL 17491939 (10th Cir. Dec. 8, 2022); *Needham v. Utah*, No. 2:16-cv-146 JNP, 2018 WL 10798631, at *1 (D. Utah Jan. 5, 2018); *cf. Pedockie v. Bigelow*, 581 F. App'x 698, 700 (10th Cir. 2014); *Andrews v. Deland*, 943 F.2d 1162, 1189–92 (10th Cir. 1991).

[7] On August 7, 2017, the judge who previously presided over this case entered an order in which he listed the claims he believed were procedurally defaulted, *see* Dkt. No. 242 at 4–5, including most of those referenced here and in Part IV.C. At a later oral argument, Mr. Kell's counsel "agree[d] with most of" the list of defaulted claims and apparently maintained that only claims Thirteen (E) and (G) and Twenty-five (F)—all of which this court will consider on the merits—did not belong on the previous judge's list of defaulted claims. Dkt. No. 252 at 4. Still, out of an abundance of caution, the court has carefully reviewed the briefing to determine independently that the claims referenced in this section are defaulted.

[8] In Claim Fifteen (Q), which Mr. Kell raises for the first time in his reply brief, he asserts cumulative prejudice from all of the errors alleged in Claim Fifteen. Given that the court considers none of these errors on the merits, however, it cannot consider a claim that such errors cumulatively prejudiced Mr. Kell—even assuming that it could otherwise properly consider a claim raised only in a petitioner's reply brief.

rule," this court cannot consider these claims unless Mr. Kell establishes "cause for the default and actual prejudice" resulting from a violation of federal law. *Coleman,* 501 U.S. at 750.

The Utah Supreme Court rejected all of these claims (other than Claim Three (F)) in *Kell III*. These claims are all based on alleged ineffective assistance of counsel at trial, on direct appeal, or both. After failing to include any of these claims in his first post-conviction petition in state court, Mr. Kell attempted to raise them in a motion under Utah Rule of Civil Procedure 60(b) to reconsider the denial of that petition. The Utah Supreme Court concluded that Mr. Kell was required to raise these claims in his first petition and that Utah Rule of Civil Procedure 60(b) did not allow him to raise them for the first time in a motion for reconsideration of that petition's denial. *See Kell III*, 285 P.3d at 1141.

The Utah Supreme Court's holding rested on the procedural ground that Mr. Kell's Rule 60(b) motion was, in effect, a successive petition for state post-conviction relief. *See id.* at 1140. The court held that Mr. Kell could not use a Rule 60(b) motion to reconsider the denial of his first petition for state post-conviction relief to circumvent the statutory limits on successive state post-conviction petitions. *See id.* at 1142. Because the PCRA would bar Mr. Kell from bringing new claims for ineffective assistance of trial or appellate counsel in a second post-conviction petition, the court concluded that Mr. Kell was procedurally barred from raising these claims for the first time in his Rule 60(b) motion. *See id.* at 1141. It follows that the court cannot review the claims rejected in *Kell III* unless Mr. Kell either shows that the Utah Supreme Court's holding in that case did not rest on independent and adequate state grounds or establishes cause and prejudice.

Mr. Kell argues that the state procedural ground on which the court in *Kell III* rejected his claims is not adequate. In particular, he argues that the Utah Supreme Court's decision in *Kell III*

is inconsistent with its previous decision in *Menzies v. Galetka*, 150 P.3d 480 (Utah 2006), and thus that the Utah Supreme Court has not consistently and evenhandedly applied the procedural rule invoked in *Kell III*.

In *Menzies*, the Utah Supreme Court concluded that the petitioner was entitled to "relief under rule 60(b)(6)" with respect to his state petition for habeas corpus relief because his counsel's "ineffective assistance . . . and gross negligence" caused him unknowingly to "default[]" his entire "post-conviction case away." 150 P.3d at 503, 514. In his briefing, Mr. Kell relies on what he describes as the *Menzies* court's reasoning "that a court has 'broad discretion,' that it 'should exercise its discretion in favor of granting relief,' and that '60(b) motions should be liberally granted because of the equitable nature of the rule.'" Dkt. No. 115 at 14.

Mr. Kell mischaracterizes *Menzies*' holding. What the *Menzies* court actually said was that "[a] district court has broad discretion to rule on *a motion to set aside* a *default judgment* under rule 60(b) of the Utah Rules of Civil Procedure." 150 P.3d at 501 (emphasis added). Because *Menzies* concerned a motion to set aside a default judgment, its holding is not inconsistent with *Kell III*, in which Mr. Kell moved to set aside a judgment reached through the adversarial process after litigation and briefing.

Mr. Kell also maintains that the Utah Supreme Court has not consistently applied Rule 60(b) to petitions for postconviction review after *Menzies*. He first argues that in *Archuleta v. Galetka,* 267 P.3d 232, 274 (Utah 2011), the court applied a "different rule" from the one announced in *Menzies.* Mr. Kell defines the "different" rule as follows: "[t]he court held that relief was not warranted in Archuleta's case because the attorney did not 'blatantly disregard his or her representative capacity and subvert the client's interest.'" Dkt. No. 115 at 9 (cleaned up). But this is an inaccurate reading of *Archuleta*. In affirming the district court's denial of

Archuleta's rule 60(b) motion, the Utah Supreme Court made clear that it was not applying a different rule than it did in *Menzies*. Rather, the court explicitly stated that it was "clarify[ing] the limited scope of [its] decision in *Menzies*." *Archuleta*, 267 P.3d at 274.

The court distinguished the facts in *Archuleta* from those in *Menzies* and explained in detail why the decision in *Menzies* did not apply to the specific circumstances of the *Archuleta* case. The court listed multiple examples of Mr. "Menzies' inexcusable and grossly negligent representation," concluded that Mr. "Menzies' counsel willfully abdicated his role as advocate," and observed the "litany of defaults" for which Mr. Menzies' counsel was responsible. *Id.* at 274–76. The court then concluded that Mr. "Archuleta's representation during the habeas corpus proceeding in this case comes nowhere near the deplorable representation that [it] observed in *Menzies*." *Id.* at 276. Based on that finding, the court affirmed the district court's denial of Archuleta's rule 60(b) motion.

Mr. Kell next argued that in *Kell III*, the Utah Supreme Court "engaged the matter in yet another way." Dkt. No. 115 at 15. He asserts that rather than following the rule it set forth in *Menzies*, and upon which he had relied, the court instead looked to the "delicate balance between two countervailing impulses: the desire to preserve the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts and opted for finality over justice." *Id.* at 16 (cleaned up).

But this is not an accurate description of the decision in *Kell III*. The Utah Supreme Court expressly distinguished *Menzies* on the ground that the court there applied rule 60(b) to a default judgment, while Mr. Kell's case did not involve a default judgment:

> Although the language of the rule does not distinguish default judgments from other judgments, additional considerations come into play when the 60(b) motion concerns a default judgment. We acknowledged those considerations in *Menzies* when we noted the inequity that arises when a litigant has no opportunity for

> review. We stated that a district court should be generally indulgent toward vacating *default judgments* and must incline towards granting relief in a doubtful case to the end that the party may have a hearing. We concluded, it is quite uniformly regarded as an abuse of discretion to refuse to vacate *a default judgment* where there is a reasonable justification or excuse for the failure and timely application is made to set it aside.
>
> In this situation, however, Mr. Kell did not move to set aside a default judgment in the hopes of obtaining a hearing. He moved to set aside a judgment that had been heard, ruled on, and appealed, but he attempted to do so on the grounds that the proceedings should be disregarded because his counsel had been ineffective. The generous language of *Menzies* directed at default judgments therefore does not control this case.

*Kell III*, 285 P.3d at 1138 (cleaned up).

This analysis clearly indicates the consistency of the Utah Supreme Court's application of Rule 60(b). Without having shown that his own post-conviction counsel demonstrated anything close to the type of "dereliction" the court found in *Menzies*, *Archuleta*, 267 P.3d at 275, Mr. Kell has not established that the Utah Supreme Court's application of Rule 60(b) in *Kell III* is inconsistent with its prior decisions and thus inadequate as a state-law procedural bar.

The Utah Supreme Court also noted in *Kell III* that in 2008, after *Menzies* was decided, the Utah Legislature amended the PCRA to prohibit claims of ineffective assistance of *postconviction* counsel in a capital case: "Nothing in this chapter shall be construed as creating the right to the effective assistance of postconviction counsel, and relief may not be granted on any claim that postconviction counsel was ineffective." Utah Code Ann. § 78B-9-202(4). The PCRA also plainly states, as already discussed, that it "establishes *the sole remedy* for any person who challenges a conviction or sentence for a criminal offense and who has exhausted all other legal remedies, including a direct appeal . . . [and] replaces all prior remedies for review, including extraordinary or common law writs." Utah Code Ann. § 78B-9-102(1)(a). And, as previously noted, the Utah Supreme Court incorporated the latter limitation in Rule 65C. These

provisions were not at issue in *Menzies* because the statutory amendments had not yet been enacted and the revised rule had not yet been adopted.

Because the PCRA allows postconviction petitions only under circumstances defined by statute, the Utah Supreme Court said, "we foresee that 60(b) motions might be brought in an attempt to evade the PCRA. This is not permitted by law." *Kell III*, 285 P.3d at 1139. The court said that Mr. Kell's motion in *Kell III* "provides us with the first opportunity to explore the tension between rule 60(b) and the PCRA." *Id.* (defining "tension" as "the activity at the intersection of two conflicting legal principles"). After a thorough discussion of that tension, the court held that "the rule might be an appropriate avenue when the motion does not attempt to achieve relief that the PCRA would bar. But when a 60(b) motion acts as a substitute for a prohibited postconviction petition, we cannot allow its use." *Id.* at 1140.

For all of these reasons, the court concludes that *Kell III* rests on an adequate state procedural rule that has not been applied "in an irregular, arbitrary, or inconsistent manner." *Swaggart Ministries*, 493 U.S. at 399. In all events, even if the court is mistaken that *Menzies* can be reconciled with *Kell III* and *Archuleta*, it does not follow that *Menzies* amounts to more than an isolated departure from the procedural rule consistently applied by the Utah Supreme Court in other cases. And it is well settled that an "occasional act of grace" does not suffice to demonstrate that a state supreme court "fails to apply its procedural rule regularly and consistently." *Andrews*, 943 F.2d at 1190 (quoting *Dugger v. Adams*, 489 U.S. 401, 411 n.6 (1989)).

Mr. Kell does not appear to challenge the independence of this procedural bar, except to the extent that in Claim Thirty-two, he contends that its application violates his "right to equal protection and a fair sentencing under the Fourteenth Amendment, as well as his Eighth

Amendment right to be free from cruel and unusual punishment and his Sixth Amendment right to counsel." Dkt. No. 94 at 175. But he does not develop these arguments, let alone offer any support for the proposition that the application of the state procedural rule invoked in *Kell III* turns on, or is somehow intertwined with, these federal constitutional issues. Rather, he represents in his petition that he merely "seeks to preserve his claim that his rights *will* be violated, and he *will* be prejudiced, by the state courts' failure to address the claims and allegations made in his Rule 60(b) motion." *Id.* (emphasis added). Given the absence of any serious argument to the contrary, the court readily concludes that the state procedural rule invoked in *Kell III* is independent of federal law. It follows that the ineffective-assistance claims listed above can be considered only if Mr. Kell shows cause and prejudice. And, given the lack of development of Claim Thirty-two, including in Mr. Kell's reply brief, *see* Dkt. No. 115 at 206, the court does not further consider this claim.

**D.**

As already explained, this court may still review Mr. Kell's defaulted claims—both those that the state courts have actually rejected and those that Mr. Kell never submitted to the Utah Supreme Court but that the state courts would reject on independent and adequate state procedural grounds if he sought to do so now— if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Dulin v. Cook*, 957 F.2d 758,760 (10th Cir. 1992) (quoting *Coleman,* 501 U.S. at 750).

**1.**

Again, "[c]ause excusing a procedural default must be some objective factor external to the habeas petitioner, not fairly attributable to him, that impeded his efforts to comply with the procedural rule in question." *Spears*, 343 F.3d at 1255.

Mr. Kell's justification for failing to raise all but four of his defaulted claims before the Utah Supreme Court in accordance with Utah's procedural rules is ineffective assistance of counsel in post-conviction proceedings. Mr. Kell acknowledges that, generally, ineffective assistance of post-conviction counsel that results in procedural default of a claim does not suffice as cause to excuse the default in a federal habeas action. *See* Dkt. No. 115 at 19; *Martinez v. Ryan,* 566 U.S. 1 (2012); *Trevino v. Thaler*, 569 U.S. 413 (2013). He points out, however, that the United States Supreme Court recognized an exception to this rule in *Martinez,* where it "held that when state law requires ineffective assistance of trial counsel claims to be raised in an 'initial-review collateral proceeding' rather than on direct review, procedural default will not bar a federal habeas court from reviewing the merits of a substantial claim if, in the initial-review collateral proceeding, the petitioner's counsel was ineffective or the petitioner had no counsel." Dkt. No. 15 at 19–20. And in *Trevino*, the Court extended the *Martinez* exception to situations where the ability to bring ineffective assistance of trial counsel claims on direct appeal theoretically exists but the "structure and design of the [State's] system in actual operation . . . make it virtually impossible for an ineffective assistance claim to be presented on direct review." 569 U.S. at 423 (cleaned up).

Mr. Kell has strenuously argued over the years that the exception recognized in *Martinez* and *Trevino* applies to Utah's post-conviction regime. *See* Dkt. No. 94 at 158–62; Dkt. No. 115 at 19–29; Dkt. No. 232 at 7–12. His arguments are now foreclosed, however, by the Tenth Circuit's decision in *Finlayson v. Utah*, where that court squarely held that this exception does not apply in Utah: "Utah provides a meaningful opportunity to present ineffective assistance of trial counsel claims on direct appeal and thus *Trevino* lends no relief to Utah prisoners who procedurally default in their state-court collateral proceedings." 6 F.4th 1235, 1243–44 (10th Cir.

2021). It follows that Mr. Kell cannot demonstrate cause for his defaults based on ineffective assistance of post-conviction counsel, and all of his arguments based on *Martinez* and *Trevino* fail.

With respect to Claim Eleven, Mr. Kell maintains that the State failed to disclose "material, exculpatory evidence to the defense." Dkt. No. 115 at 72. He argues that he can "show cause and prejudice based on the merits of [the] claim itself." *Id.* (citing *Strickler v. Greene*, 527 U.S. 263, 282 (1999)).

Although the Supreme Court held in *Strickler* that it is "reasonable" for "counsel . . . in state habeas proceedings" to "rely on . . . the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials" and thus that the prosecutor's failure to do so can justify a default in state habeas proceedings, 527 U.S. at 284, this holding rests, of course, on the premise that state habeas counsel was not aware of the missing exculpatory materials. Here, by contrast, Mr. Kell's federal habeas counsel was aware of the allegedly undisclosed exculpatory material no later than February 10, 2010, *see* Dkt. No. 94 at 63, and of course Mr. Kell filed the pending petition, which includes Claim Eleven, in 2013. Nevertheless, when Mr. Kell moved for a *Rhines* stay in 2017 to attempt to exhaust Claims Three (D) and Three (F) before the state courts, he did not seek to exhaust Claim Eleven—nor, of course, did he attempt to do so within one-year of when he became aware of this alleged violation, as is required under the PCRA. *See* Dkt. No. 245 at 21.

The court accordingly concludes that to whatever extent Mr. Kell's state postconviction counsel was not aware of the alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), before 2013 and this lack of knowledge provided cause for failing to raise a claim based on this alleged violation in state court before that point,

the cause ended once Mr. Kell's counsel became aware of the basis for such a claim and nevertheless failed to attempt to exhaust it in state court or to argue that exhaustion would be futile. In other words, the failure to include Claim Eleven among those Mr. Kell attempted to exhaust in 2017 (or to attempt to exhaust it sooner) constitutes an independent default of this claim that cannot be justified by counsel's lack of knowledge. If anything, it can be justified only by ineffective assistance of that postconviction counsel but, as already discussed, such ineffective assistance does not qualify as cause in Utah. It follows that Mr. Kell has not shown cause to excuse the default of Claim Eleven.[9]

Next, for Claims Two and Three (E), Mr. Kell also raises ineffective assistance of appellate counsel as cause for his failure to present the claims to the Utah Supreme Court on direct review. But "ineffective assistance of appellate counsel does not excuse [a] petitioner's failure to present" a claim "in his first post-conviction application." *Wood v. Trammell*, 2015 WL 6621397, at *34 (W.D. Okla. Oct. 30, 2015). After all, "the exhaustion doctrine . . . generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986).[10]

---

[9] In Claim Twenty, Mr. Kell seeks to "preserve a claim that the State failed to provide . . . crucial exculpatory and impeachment evidence in direct violation of *Brady*." Dkt. No. 94 at 132. He clarifies in his reply brief that the "facts relating to this claim are more particularly laid out in Claim Eleven." Dkt. No. 115 at 157. It follows that, to the extent Claim Twenty is an independent claim at all, it fails as defaulted without cause for the same reasons as Claim Eleven.

[10] Even if the ineffective assistance of appellate counsel could present sufficient cause despite post-conviction counsel's failure to raise these claims in Mr. Kell's first post-conviction petition in state court, moreover, the court now concludes that Mr. Kell has not demonstrated that his appellate counsel was constitutionally ineffective in not raising these claims on direct review. After all, appellate "counsel need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal," and

Finally, for Claim Three (D), Mr. Kell presumably asserts the same arguments to show cause that he did with respect to Claim Three (F), and the court rejects those arguments for the reasons already explained.

**2.**

Even had Mr. Kell made a sufficient showing of cause, he would also need to demonstrate actual prejudice to prevail on any of his defaulted claims. Although the court need not rely on a lack of prejudice in reaching its ruling, it does not believe that Mr. Kell has met this requirement.

To establish "actual prejudice," Mr. Kell "must show 'not merely that the errors at trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Murray*, 477 U.S. at 494 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)) (cleaned up). Mr. Kell would, in other words, have to show he "was denied fundamental fairness at trial." *Id.* (cleaned up). This showing turns on the "particular circumstances" of his case, meaning the court must consider the "total context of the events at trial." *Frady*, 456 U.S. at 169–70.

"[A]ctual prejudice" requires "a reasonable probability that the result of the trial [or sentencing] would have been different." *Strickler*, 527 U.S. at 289 (cleaned up). In other words,

---

"deferential consideration must be given to any professional judgment involved in [a claim's] omission." *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003) (cleaned up).

The court concludes that counsel's decision not to raise the substance of Claims Two and Three (E) on direct appeal was not constitutionally inadequate. Claim Two is closely related to—indeed, perhaps completely intertwined with—Claim One, which counsel did raise on direct appeal, and the court will not second-guess counsel's choice of how exactly to present this issue to the Utah Supreme Court. And Claim Three (E) is based on the assertion that the "trial court [did] not clearly state that a life sentence will result in imprisonment for the duration of one's natural life," Dkt. No. 115 at 53, a claim that the court concludes is insubstantial—especially given the jury's finding, during the sentencing phase, that Mr. Kell was already serving a life sentence without the possibility of parole at the time he murdered Mr. Blackmon.

Mr. Kell would have to demonstrate a reasonable probability that the jury would not have found him guilty of capital murder—or at least would not have recommended a sentence of death. The court is unconvinced that he has done so. While already serving life without parole for another murder, Mr. Kell stabbed fellow inmate Lonnie Blackmon sixty-seven times in the eyes, face, neck, and back, until he bled to death—all of which was captured on video and shown to the jury. The jury also heard evidence that the murder was motivated by Mr. Blackmon's race. Given the essentially undeniable presence of the multiple aggravating factors that the jury found qualified Mr. Kell for the death penalty, Mr. Kell could hardly show, absent specific evidence the likes of which he has not provided, that there was a reasonable likelihood of a different verdict or sentence or that any error worked to his actual and substantial disadvantage.

Specifically, with respect to Claim Eleven, the court concludes that even if Mr. Kell could show cause sufficient to overcome the failure to timely exhaust this claim once his counsel became aware of it, he cannot demonstrate a reasonable likelihood that the outcome would have been different had he come into possession of the allegedly exculpatory evidence sooner.

In Claim Eleven, Mr. Kell asserts that the State offered the testimony of "inmate Francisco Colon as a rebuttal witness" and that Mr. Colon "testified that he witnessed the murder from his cell" and "witnessed all subsequent events through the bottom of his door with a locker mirror," including hearing Mr. Kell make white supremacist claims and assure another inmate that Mr. Blackmon would "die in a minute." Dkt. No. 94 at 62. He also asserts that Mr. Colon testified that he was not "receiving any promises for his testimony" from the State, but instead "that he had merely requested that" the fact he was testifying for the State "be brought to the Board of Pardons' attention." *Id.* at 63.

Mr. Kell now maintains that his federal habeas counsel investigated, determined that it would not have been possible to witness the events from the position of Mr. Colon's cell, and discovered that an assistant attorney general had requested that Mr. "Colon's supervision cease and his sentence be terminated" based on "his truthful testimony in the capital murder trial of Troy Michael Kell." *Id.* at 64 (cleaned up).

Even if this evidence was sufficiently exculpatory or had sufficient impeachment value to require its disclosure under *Brady* and *Giglio*, Mr. Kell has not demonstrated that impeaching Mr. Colon's testimony would have led to a different result, either at trial or at sentencing. The jury watched the murder on video, and overwhelming evidence—including not only Mr. Kell's own statements during the murder, but also the "Dear Luther letter" and Mr. Kell's racist statements to the prison guard discussed below in Claims Thirteen (C) and (D)—demonstrated Mr. Kell's white supremacist tendencies. The court accordingly concludes that, even if Mr. Kell could have more effectively impeached Mr. Colon had he known about a potential deal with parole, Mr. Colon's testimony was sufficiently "cumulative" that "its exclusion would not have changed the result" of the proceedings. *United States v. Mucci*, 630 F.2d 737, 742 (10th Cir. 1980).

## V.

The court concludes that Mr. Kell arguably exhausted the following claims, at least in part, and that at least portions of these claims may therefore be considered on the merits: One (A), (B), and (D); Five; Six; Thirteen (C), (D), (E), (F), (G); Nineteen; and Twenty-five (C) and (F). The court will also consider Claims Twenty-nine and Thirty-one.

This petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), which became effective on April 24, 1996. Under this statute, federal habeas relief

may not be granted on claims adjudicated on the merits by a state court unless the state court's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In the latter case, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1).

"The 'contrary to' and 'unreasonable application' clauses have independent meaning." *Drinkert v. Payne*, 90 F.4th 1043, 1049 (10th Cir. 2024) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)) (cleaned up). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, "[t]he state court's application of clearly established law must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). And where the Supreme Court's cases "give no clear answer to the question presented . . . it

cannot be said that the state court unreasonably applied clearly established Federal law." *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam) (cleaned up).

**A.**

In Claim One, Mr. Kell contends that he was denied his Fifth, Sixth, and Fourteenth Amendment rights to a fair and public trial, to the presumption of innocence, and to equal protection of law by the trial court's decision to hold all pretrial proceedings, his jury trial, and his sentencing proceedings inside a prison under what he claims were severe and unwarranted security measures. Mr. Kell raised this issue in part on direct appeal although, as previously noted, he concedes that he failed to raise the substance of Claim One (C), which relates to what he describes as "extreme security measures" and his alleged "shackling" during the trial, before the Utah Supreme Court, and the court has found no mention of this claim in his briefing on direct appeal. Dkt. No. 94 at 33; *see also* Dkt. No. 115 at 43. The court accordingly considers issues raised in Claim One (C) only to the extent the Utah Supreme Court touched on them in connection with its ruling on Mr. Kell's non-defaulted claims regarding the alleged violation of his constitutional rights that he contends arose from being tried in a courtroom inside a prison and the general security measures associated with that setting.

Citing *Holbrook v. Flynn,* 475 U.S. 560, 567 (1986), the Utah Supreme Court held that trying Mr. Kell in a courtroom at the CUCF prison did not violate his right to a fair trial "because the actions taken by the trial court were not inherently prejudicial." *Kell I*, 61 P.3d at 1026. In so holding, that court incorporated its reasoning from its earlier decision rejecting the same argument made by Mr. Kell's accomplice, Eric Daniels. *See id.* (citing *State v. Daniels*, 40 P.3d 611 (Utah 2002)). In *Daniels*, the Utah Supreme Court recognized that the Supreme Court had held in *Estelle v. Williams*, 425 U.S. 501 (1976), that trying a defendant in prison clothing would

likely be a "'continuing influence throughout the trial.'" *Daniels*, 40 P.3d at 618 (quoting *Estelle*, 425 U.S. at 505). And it concluded that the same would likely be true of trying a defendant inside a prison. But the *Daniels* court reasoned that "where an inmate is tried in prison clothing for the murder of a fellow inmate, no prejudice can result from seeing that which is already known"—that is, that the inmate-defendant was already incarcerated at the time of the charged murder. *Id*. (cleaned up).

The court extrapolated that "where the defendant was incarcerated and the alleged crime was committed inside the prison, those facts" "were inevitably going to be, and were, 'adduced as proof at trial.'" *Id*. (quoting *Holbrook*, 475 U.S. at 567). It follows, the court concluded, that "trying [a] defendant in a courtroom located inside a prison did not present an unacceptable risk of presenting impermissible factors" that would not otherwise become known to the jurors and thus potentially affect their perception. *Id.* The Utah Supreme Court adopted this same reasoning in rejecting Mr. Kell's analogous claims on direct appeal. *See Kell I*, 61 P.3d at 1026.

Besides incorporating its reasoning in *Daniels*, the *Kell I* court noted that the juror questionnaire asked whether the trial setting would "affect [the juror's] ability to sit as a juror in this case" and that none of the ten potential jurors who answered the question in the affirmative ended up on the jury. *Id.* (cleaned up).

Mr. Kell maintains that the Utah Supreme Court's reliance on the jury questionnaire contravened the Supreme Court's conclusion in *Holbrook* that "jurors will not necessarily be fully conscious of the effect" a potentially prejudicial attribute of trial "will have on their attitude toward the accused" and thus that "little stock [should] be placed in jurors' claims" that they will not be prejudiced by the attribute. 475 U.S. at 570.

But although the Utah Supreme Court mentioned the juror questionnaire responses, its primary focus was its previous analysis in *Daniels.* The *Daniels* court, relying on facts that applied to both Mr. Daniels and Mr. Kell, repeatedly cited and applied *Holbrook* and *Estelle* to hold that the trial in the CUCF was not inherently prejudicial.

Mr. Kell has not shown that the Utah Supreme Court's holding "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Although the *Holbrook* Court concluded that juror questionnaires themselves may not suffice to demonstrate a lack of prejudice, its ultimate holding was that "if the challenged practice is not found inherently prejudicial . . . the inquiry is over." 475 U.S. at 572. The Utah Supreme Court analyzed whether trying Mr. Kell on the prison grounds was inherently prejudicial and concluded it was not under the circumstances, especially because the jury would inevitably learn that Mr. Kell was an inmate at the time the crime was committed anyway. *See Kell I*, 61 P.3d at 1026. The court accordingly applied the legal standard exactly as set out in *Holbrook*. And the *Estelle* Court neither held nor necessarily implied that trying a defendant in a prison courtroom "for an offense committed in confinement" amounts to *per se* reversible constitutional error. 425 U.S. at 507. Nor did it dictate a legal standard for addressing such a claim of error contrary to that embraced in *Holbrook* and applied by the Utah Supreme Court here. The court thus concludes that no Supreme Court precedent clearly establishes that a prison-courtroom setting is inherently prejudicial or that a case-by-case approach is not the appropriate way to determine whether holding a trial in a prison courtroom unconstitutionally prejudices a defendant.

Nor has Mr. Kell demonstrated that the Utah Supreme Court's "application" of the *Holbrook* and *Estelle* holdings was objectively "unreasonable." 28 U.S.C. § 2254(d)(1). The

Court concluded in *Holbrook* that "use of identifiable security guards in the courtroom" is not "inherently prejudicial" and that "a case-by-case approach is" required to determine whether such a practice might "create the impression in the minds of the jury that the defendant is dangerous or untrustworthy." 475 U.S. at 569 (cleaned up). And in *Estelle*, the Court approvingly cited lower courts' holdings that trying a defendant "in jail clothes" did not create prejudicial error when the defendant was charged with committing "murder[] . . . while confined," even though "compelling an accused to wear jail clothing furthers no essential state policy . . . whatever"—unlike the decision to try Mr. Kell in the CUCF courtroom and the associated general security measures at issue here. 425 U.S. at 505, 507.

Although Mr. Kell maintains that the prison courtroom setting unconstitutionally prejudiced the jury against him, he does not present a convincing argument that any prejudice the jury might have developed from the setting would not have been duplicated by the copious evidence introduced at trial that demonstrated his status as an inmate at the time of the murder. In all events, he certainly has not convincingly argued that the Utah Supreme Court unreasonably applied the holdings of *Holbrook* and *Estelle* in conducting an individualized assessment of his case and concluding that his status as a convicted murderer, in addition to the fact that most of the witnesses would be high-security inmates incarcerated at the same facility, justified trying him in a secure location where he would not present a risk to the public or need to be more significantly restrained than he was in the prison courtroom setting.[11]

---

[11] Although the Utah Supreme Court did not necessarily rely on the considerations weighed by the trial court in deciding where to hold Mr. Kell's trial, its conclusion is certainly buttressed by them. The trial court concluded that holding the trial in the prison courtroom would result in less prejudice to Mr. Kell than would holding it in a regular courthouse because, given the security risk Mr. Kell posed, holding the trial in a regular courthouse would require more "onerous security measures"—including fully shackling Mr. Kell in the jurors' presence—than

Mr. Kell next contends that the decision to hold the trial—and all proceedings relating to the trial—in the prison courtroom deprived him of his Sixth Amendment right to public proceedings. When he raised this issue on direct appeal, the Utah Supreme Court quoted *Waller v. Georgia*, 467 U.S. 39, 46 (1984), to identify the "essential purpose" served by a public trial: "that the public may see the accused is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Kell I*, 61 P.3d at 1027 (cleaned up). The Utah Supreme Court nevertheless concluded that although Mr. Kell's trial was held in the prison, "there is no evidence that [his] right to a public trial was violated" because "the proceedings were in no way closed to the public" and, "[w]hile the prison courtroom . . . may not have been as inviting to the public as another venue, there is no evidence that the public could not freely attend." *Id.*

Although Mr. Kell cites cases such as *Waller* to support his claim that he had the right to a public trial, he does not appear to seriously argue that the Utah Supreme Court held otherwise—and, to the contrary, the decision in *Kell I* makes clear that the Utah Supreme Court recognized that Mr. Kell had this right. It appears that the substance of his challenge relates instead to the court's factual conclusion that he did indeed have a public trial. But Mr. Kell identifies no evidence or anything in the record showing that any member of the public was dissuaded from attending or denied access to his trial, nor does he seriously argue that no members of the public attended the trial—let alone identify any evidence or anything in the

---

would be required if the trial were held in the prison courthouse. Tr. 5922, 5924. The fact that the trial court conscientiously concluded that holding the trial in the prison courthouse would, on balance, lead to less inherent prejudice against Mr. Kell strongly supports the Utah Supreme Court's conclusion that doing so did not violate Mr. Kell's rights.

record that would support such an argument. At most, he quibbles with minor factual details in the Utah Supreme Court's decision and casts vague aspersions regarding the trial court's alleged failure adequately to consider whether the public was discouraged from attending or was permitted to attend any pretrial proceedings. *See* Dkt. No. 94 at 31. But these quibbles and aspersions fall far short of "rebutting the presumption" that the state court's "determination of [this] factual issue" was "correct[] . . . by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).[12]

Finally, Mr. Kell argues that "all of the errors" relating to Claim One "require reversal" given their "aggregate" prejudicial effect. Dkt. No. 94 at 34. But the court has already concluded that none of the cluster of individual claims composing Claim One amounts to any error of the kind that justifies relief under 28 U.S.C. § 2554(d)–(e). And in considering the "cumulative effect" of multiple errors, the court may not consider any "effect of non-errors." *United States v. Haddock*, 12 F.3d 950, 960 (10th Cir. 1993). It follows that Mr. Kell has not demonstrated any aggregated prejudice—or any prejudice at all—relating to Claim One.

**B.**

In Claim Five, Mr. Kell argues, citing *Beck v. Alabama*, 447 U.S. 625 (1980), that his due process rights were violated because (1) the jury was not instructed to consider imperfect self-defense manslaughter; and (2) the jury was not permitted to consider the lesser offense of extreme-emotional-disturbance manslaughter until it first acquitted him of aggravated murder.

---

[12] Mr. Kell also argues that the trial court's decision to hold his pretrial proceedings at the prison courtroom violated his Sixth Amendment right to public access to those proceedings. To the extent Mr. Kell exhausted this argument before the Utah Supreme Court, the court concludes that its reasoning about the trial itself applies to the pretrial proceedings as well and that Mr. Kell has not demonstrated by clear and convincing evidence that any member of the public was excluded from or dissuaded from attending his pretrial proceedings because of their location.

He maintains that these instructions abridged "his right to present defenses to the aggravated murder charge." Dkt. No. 94 at 47.

**1.**

The Utah Supreme Court held that Mr. Kell was not entitled to a jury instruction regarding the defense of imperfect self-defense manslaughter because "the evidence" was "insufficient to provide a rational basis for the jury to acquit Kell of aggravated murder and convict him of imperfect self-defense manslaughter." *Kell I*, 61 P.3d at 1029. It concluded that Mr. "Kell's claim that he acted out of self-defense is eclipsed by the evidence suggesting that [his] motive . . . was simply racism," including evidence that Mr. Kell "was a white supremacist, that he had written letters expressing a desire to harm an African-American inmate, that Kell attacked Blackmon viciously and relentlessly, and that Kell shouted racial epithets during and after the attack." *Id.* It also concluded that "even if Kell did act in part out of self-defense, there was substantial evidence that Kell could not have believed himself to be in imminent danger at the time of the attack" because "[t]he evidence clearly showed that Blackmon was attacked from the rear" and "was unarmed and handcuffed during the attack, that Daniels assisted Kell during the attack, and that Kell stabbed Blackmon multiple times and did not relent when it was obvious Blackmon would not fight back." *Id.*

The Supreme Court has held that "if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, [a State] is constitutionally prohibited from withdrawing that option from the jury in a capital case." *Beck*, 447 U.S. at 638. But a defendant has the right to a lesser-include offense instruction only if "the evidence warrants it." *Id.* at 636.

The Utah Supreme Court did not cite *Beck*, but it applied the same standard based on Utah's own law regarding lesser-included instructions. *See Kell I*, 61 P.3d at 1028–29.[13] In concluding that the evidence did not warrant the instruction Mr. Kell requested, then, it followed the appropriate constitutional standard as well, and Mr. Kell can thus argue only that the Utah Supreme Court's "determination" of the underlying "factual issue"—whether the evidence presented to the jury warranted the instruction—was incorrect. 28 U.S.C. § 2254(e)(1). Mr. Kell identifies no "clear and convincing evidence," however, that demonstrates that the Utah Supreme Court resolved this factual question incorrectly. *Id.* It follows that he cannot prevail on his contention that the lack of instruction regarding imperfect self-defense manslaughter violated his clearly established federal constitutional rights.

**2.**

Mr. Kell also maintains that the trial court's "order of deliberations" instruction violated *Beck. See* Dkt. No. 94 at 50. At the trial, the "jury was explicitly instructed to order its deliberations and not to consider [the] lesser included offenses" on which it was instructed, including extreme-emotional-disturbance manslaughter, "unless it found the defendant innocent of the greater offense." *Kell I*, 61 P.3d at 1030. The Utah Supreme Court held that the language

[13] In addition, in *Schad v. Arizona*, 501 U.S. 624, 645–48 (1991), the Supreme Court held that a trial court can violate *Beck* only when the jury is given an "all-or-nothing" choice of convicting the defendant of capital murder or convicting him of nothing at all. But when a court gives capital juries a "third option" of convicting of a lesser, non-capital offense, it has not violated *Beck* even if the "third option" is not the specific lesser offense the defendant requested. *Id.* at 647. In Mr. Kell's case, the jury was not given an all-or-nothing choice. Although the trial court denied Mr. Kell's request for a jury instruction on the defense of imperfect self-defense manslaughter, it did instruct the jury on the lesser-included offenses of non-capital murder and reckless-or-extreme-emotional-disturbance manslaughter. ROA 2307–08. Mr. Kell's jury thus had a "third option" (and a fourth option, for that matter) to a capital murder conviction or no conviction at all. In light of *Schad*, the court cannot conclude that the Utah Supreme Court's ruling was contrary to, or an unreasonable application of, federal law as clearly established by the Supreme Court.

of these jury instructions was improper as a matter of state law. But it concluded that the instructions as a whole cured the state law error because they required the jury to consider and reject Mr. Kell's extreme emotional disturbance theory *before* convicting him of capital murder. *See id.*[14]

Mr. Kell asserts that the "order of deliberations" instruction violated *Beck* because it effectively prevented the jury from "deliberat[ing] on" the theory of extreme-emotional-disturbance manslaughter "in a manner that allowed [it] to function as a real alternative to aggravated murder." Dkt. No. 345 at 4. This claim fails, however, because the jury *was* instructed about the lesser-included offense of extreme-emotional-disturbance manslaughter, *see* Dkt. No. 106-3 at 170, and *Beck* does not clearly establish that a jury must be permitted to consider a lesser-included offense that may be supported by the evidence before or at the same time it considers a charge of capital murder, at least provided the jury is instructed on both offenses before it begins its deliberations as it was here. Indeed, the Supreme Court in *Beck* did not discuss the order of deliberations at all, and Mr. Kell identifies no other case in which it has done so. Nor does the reasoning in *Beck*—which was based on "the risk of an unwarranted conviction" of a capital offense "when the evidence unquestionably establishes that the defendant is guilty of a serious violent offense but leaves some doubt with respect to an element that would justify conviction of a capital offense," 447 U.S. at 637 (cleaned up)—clearly imply that the trial court's instruction that the jury not to consider the lesser-included offenses on which it had been instructed unless it first found Mr. Kell not guilty of aggravated murder violated Mr. Kell's federal constitutional rights.

---

[14] The state-law focus of the court's analysis is unsurprising: Mr. Kell's briefing on the issue before that court focused almost exclusively on state law, containing only a single citation to *Beck* at the end of nearly three pages of state-law analysis. *See* Dkt. No. 106-2 at 4–6.

In all events, the trial court instructed the jury that it could find Mr. Kell guilty of "aggravated murder"—the capital offense of which he was ultimately convicted—only if it found that "he was not under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse." Dkt. No. 106-3 at 165. As the Utah Supreme Court recognized, this instruction required the jury to consider Mr. Kell's extreme-emotional-disturbance theory *contemporaneously* with its resolution of the aggravated murder charge. *See Kell I*, 61 P.3d at 1030. It follows that even if *Beck* does require the trial court to permit a jury to consider lesser-included offenses before or at the same time it resolves a capital charge, there was no error here because the jury necessarily considered and rejected the crucial element of the lesser included manslaughter offense on which it was instructed—namely, that Mr. Kell acted under the influence of extreme emotional disturbance when he killed Mr. Blackmon—as a prerequisite to finding him guilty of aggravated murder.

In sum, the court concludes that to the extent Mr. Kell fairly presented to the Utah Supreme Court the argument that the trial court's order-of-deliberations instruction violated federal law, *see supra* n.14, that court's rejection of this argument was neither contrary to nor an unreasonable application of *Beck*.[15]

---

[15] Mr. Kell argues that the Utah Supreme Court's decision contravened his federal constitutional rights because it relied in part on a harmless-error analysis and the Tenth Circuit has stated that a "*Beck* error can never be harmless." Dkt. No. 94 at 49–50 (quoting *Hogan v. Gibson*, 197 F.3d 1297, 1312 n.13 (10th Cir. 1999)). But this court cannot grant relief on the ground that a state court's resolution of a federal claim contravened or unreasonably applied Tenth Circuit—as opposed to Supreme Court—precedent. In all events, the Utah Supreme Court's harmless error analysis was directed only to the instructional error it found under state law. *See Kell I*, 61 P.3d at 1030. The court does not understand the Utah Supreme Court's analysis to suggest that that court found *Beck* error but concluded it was harmless because it did not prejudice Mr. Kell. Rather, the Utah Supreme Court appears effectively to have concluded there *was no Beck error* because the requirement that the jury find that Mr. Kell was not "under the influence of extreme emotional disturbance for which there is a reasonable explanation or

**C.**

In Claim Six, Mr. Kell maintains that his constitutional right to appeal was infringed because the trial court and trial counsel did not ensure that all bench conferences were recorded. In support of this claim, Mr. Kell cites *Mayer v. City of Chicago* to argue that he cannot be denied "a record of sufficient completeness to permit proper consideration of his claims." 404 U.S. 189, 198 (1971) (cleaned up). But *Mayer* establishes only that a State cannot refuse to *give* a defendant transcripts he *requests* and needs for his appeal. *See id.* at 190, 195. Mr. Kell was not denied that right because his counsel never requested transcripts of the bench conferences. Indeed, Mr. Kell concedes that "the denial of [his] right" occurred because his trial counsel "fail[ed] to ensure that the proceedings were recorded," not because the trial court ever denied a request to record proceedings. Dkt. No. 115 at 66.

Mr. Kell makes no argument that Supreme Court precedent clearly establishes that bench conferences must be recorded absent any request, let alone that it is plain or structural error if they are not. *See Glebe v. Frost*, 574 U.S. 21, 23 (2014); *Whiteman v. Friel*, 191 F. App'x 820, 821 (10th Cir. 2006) (unpublished). More generally, neither *Mayer* nor any other Supreme Court case that Mr. Kell identifies requires state courts to record every word uttered during a trial or pretrial proceedings; to the contrary, the *Mayer* Court made clear that its holding did not "automatically entitle[]" a defendant "to a full verbatim transcript." 404 U.S. at 198. It follows that Mr. Kell's only potential claim is that the Utah Supreme Court contravened or unreasonably

---

excuse" when he killed Mr. Blackmon as a prerequisite to convicting Mr. Kell of aggravated murder necessarily ensured that it had effectively considered and rejected the lesser-included offense of extreme-emotional-disturbance manslaughter before convicting him of a capital offense. *See Hogan*, 197 F.3d at 1312 n.13 (observing that "the nature of the initial *Beck* inquiry itself is very similar to a harmless error analysis" (cleaned up)). Finally, regardless of the exact contours of the Utah Supreme Court's reasoning, the court here concludes that Mr. Kell failed to establish *Beck* error *at all*—*not* that he has established such error but that the error was harmless.

applied clearly established U.S. Supreme Court precedent in rejecting his *ineffective assistance* challenge based on the failure to request that the conferences be recorded.

Mr. Kell has not made this showing either. The Utah Supreme Court rejected Mr. Kell's claim that he received ineffective assistance of counsel at trial because he failed to demonstrate, under the standard of objective reasonableness, that counsel's performance—including by "fail[ing] to have bench conferences transcribed"—was deficient. *Kell II*, 194 P.3d at 921 & n.9. He also failed to prove prejudice by showing how the outcome of the trial would have been different but for his counsel's alleged errors. *See id* at 921. Mr. Kell has not argued that the Utah Supreme Court incorrectly stated or applied the constitutional right to effective assistance of counsel set out in *Strickland v. Washington*, 466 U.S. 668 (1984), nor has he demonstrated by clear and convincing evidence that the Utah Supreme Court incorrectly determined, as a factual matter, that counsel's alleged error in failing to ensure these conferences were recorded did not prejudice him. It follows that Mr. Kell has not shown he is entitled to relief on this claim.

Mr. Kell emphasizes that a complete record is especially imperative for the review of a conviction that resulted in a sentence of death. *See* Dkt. No. 94 at 51–52. In support of his argument, Mr. Kell quotes statements from the Utah Court of Appeals that "a record should be made of *all* proceedings of courts of record," including "conferences in chambers as well as more formal proceedings," *Birch v. Birch*, 771 P.2d 1114, 1116 (Utah Ct. App. 1989) (emphasis in original), and that "[a]lthough consistently making a record of all proceedings imposes a greater burden on the trial court and court reporters, it is impossible for an appellate court to review what may ultimately prove to be important proceedings when no record of them has been made," *Briggs v. Holcomb*, 740 P.2d 281, 283 (Utah Ct. App. 1987). But whatever *Birch* and *Briggs* may require, they are Utah Court of Appeals cases, not United States Supreme Court

precedents. Mr. Kell's argument fails, for that reason alone, to show that the Utah Supreme Court contradicted or unreasonably applied any rule of federal law that has been clearly established *by the United States Supreme Court*.[16]

**D.**

In those portions of Claim Thirteen that the court may consider on the merits, Mr. Kell contends that various evidentiary rulings made by the trial court violated his Fourteenth Amendment due process right to a fair trial, as well as his Fifth, Sixth, and Fourteenth Amendment rights to present a defense and mitigating evidence. He has not demonstrated, however, that the Utah Supreme Court contravened or unreasonably applied clearly established Supreme Court precedent or shown by clear and convincing evidence that it incorrectly found factual issues relating to these claims.

**Thirteen (C): The "Dear Luther" Letter**

The "Dear Luther" letter was a letter written by Mr. Kell to a fellow inmate located in Nevada. *See Kell I*, 61 P.3d at 1031. The State offered this letter as evidence of Mr. Kell's racial motivation. Mr. Kell objected, arguing that the racist statements in the letter referred to inmate Billie Price, not Mr. Blackmon, and that, prior to the homicide, he and Mr. Price had worked out their differences through a mediator. *See* Dkt. No. 94 at 69. Mr. Kell further maintained that because the racist statements referred to Price, the letter was not relevant to his motive for killing

---

[16] Mr. Kell appears to make the same argument in Claim Twenty-eight as he does in Claim Six, except that Claim Twenty-eight relates to his right to present complete records in this federal proceeding. The court concludes that this argument fails for the same reasons as Claim Six. Further, Mr. Kell fails even to offer speculation about how he could have been prejudiced—let alone to demonstrate that he has in fact been prejudiced—in this proceeding on account of missing state-court records.

Mr. Blackmon. The trial court overruled Mr. Kell's objection and left it to the jury to decide whether to accept Mr. Kell's uncorroborated explanation of the letter.

The Utah Supreme Court reviewed the trial court's ruling for abuse of discretion and determined there was none because the letter, though it may have had some prejudicial effect, was not "inherently prejudicial," and because it had "high probative value." *Kell I*, 61 P.3d at 1031. The Utah Supreme Court concluded that the letter provided "clear and convincing evidence of defendant's racist motivation and of his plan to kill Blackmon." *Id.* "Thus," it concluded, "the [trial] court's actions were in accord with rule 403's presumption of admissibility." *Id.*

Mr. Kell argues that the Utah Supreme Court's holding was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. He reasserts his uncorroborated theory that the letter referred to a different inmate and thus was not relevant to his motive for killing Mr. Blackmon.

Nothing in the letter itself, however, indicates it was about Mr. Price, and Mr. Kell cites no other evidence to support his uncorroborated and self-serving assertion that the letter is irrelevant to his motive. The Utah Supreme Court identified the following relevant parts of the letter:

> ¶ 3 "It'll be interesting to see how things go in about 20 days. Be all alone with 4 n*****s. I hate it when that happens Ha-ha."
>
> ¶ 4 "Lately it's been plot, strategy of inflicting pain on a n*****s. I'm getting too old for this ship though."
>
> ¶ 5 "Things on this end will be getting live soon. Looks like I'll have to show me a nappy headed monkey what some of this white power is all about. They seem to never learn . . . ."

*Id.* at 1031 n.6.

Mr. Kell has not demonstrated by "clear and convincing evidence," 28 U.S.C. § 2254(e)(1), that the Utah Supreme Court erred in finding that the letter provided "clear and convincing evidence of [his] racist motivation and of his plan to kill Blackmon," and thus that the trial court did not abuse its discretion in admitting it into evidence. *Kell I*, 61 P.3d at 1031. Indeed, based on the text of the letter, it seems more than reasonable to conclude, as the Utah Supreme Court did, that the letter referred to the contemplated murder and that things got "live"—as Mr. Kell put it—when he and others succeeded in getting Mr. Blackmon out of his cell and Mr. Kell murdered him.

**Thirteen (D): Kell's Post-Homicide Statements**

While sitting in the x-ray exam room at the CUCF infirmary following the homicide, Mr. Kell looked at Sergeant Taylor, one of the prison guards, and said, "He really liked you, you know." When Sergeant Taylor did not respond, Mr. Kell said, "I can't stand all of the—" and gestured with his hand. Sergeant Taylor replied, "I don't know what that means." Mr. Kell then said, "I hate monkeys with big mouths. I hate it when they talk about our women. They're taking over our race. I've got to do all I can to save our race. If everyone would take one out once in a while it would help a lot." *Id.* at 1031 n.7.

Prior to trial, Mr. Kell moved to suppress these statements, arguing that they were taken in violation of his *Miranda* rights and should thus be excluded. The trial court nevertheless admitted the statements into evidence. Citing *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Utah Supreme Court held that because Mr. Kell "volunteered" his statements to the prison guard, they were not excludable under *Miranda*. *Kell I*, 61 P.3d at 1031. Mr. Kell now argues that the Utah Supreme Court unreasonably applied the Supreme Court's precedent with respect to his right against self-incrimination.

The United States Supreme Court in *Innis* held that "[v]olunteered statements of any kind" are not "interrogation"; rather, "interrogation . . . must reflect a measure of compulsion above and beyond that inherent in custody itself." 446 U.S. at 299–300 (cleaned up). It "can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 302.

The Utah Supreme Court's holding that Mr. Kell's statements were admissible was not contrary to or an unreasonable application of *Innis* or *Miranda*. Under the account of the conversation given by Sergeant Taylor at trial and set forth above, Mr. Kell was the one who initiated the conversation, not Sergeant Taylor. And because law enforcement did not initiate questioning, there was no interrogation, and the statements were admissible.

To be sure, during a pretrial hearing on a motion to suppress Mr. Kell's statement to Sergeant Taylor, the State gave a slightly different account of the incident. *See* Tr. 5/31/96 at 3227–29. In that account, Mr. Kell was laughing and looking at Sergeant Taylor, who responded by asking, "What's so funny?" Mr. Kell then said that Blackmon liked Sergeant Taylor. Mr. Kell next said he was tired of something that he expressed with a hand gesture, which Sergeant Taylor did not understand. Sergeant Taylor clarified by asking, "What does that mean, the hand signal?" Mr. Kell responded with the statement that he sought to suppress.

Even if that account of the facts is accurate, Mr. Kell has not demonstrated that the Utah Supreme Court unreasonably applied *Innis*. Although on this account Mr. Kell's statement was made in response to a question from Sergeant Taylor, nothing about the account suggests—let alone demonstrates—that Sergeant Taylor "should have known" that his casual, conversational questions "were reasonably likely to elicit an incriminating response," *Innis*, 446 U.S. at 302 (emphasis omitted), or that Mr. Kell was under any "compulsion" to answer these questions

"beyond that inherent" in his custodial situation, *id.* at 300. For all of these reasons, the court concludes that Mr. Kell has failed to demonstrate that the Utah Supreme Court unreasonably applied *Innis* with respect to Claim Thirteen (D).

**Thirteen (E): Francisco Colon's Testimony in Rebuttal**

Mr. Kell next appears to argue that the Utah Supreme Court unreasonably determined the facts when it concluded that the testimony of inmate Francisco Colon as a rebuttal witness for the State "had significant probative value to rebut [Mr. Kell's] claim that the attack was not racially motivated," *Kell I*, 61 P.3d at 1032, because Mr. Kell was unconstitutionally deprived of his right to effectively cross-examine Mr. Colon and thus to demonstrate the testimony's alleged inaccuracy. The purported deprivation of the right to cross-examine is based on the violations of *Brady* and *Giglio* Mr. Kell alleges in Claim Eleven, which the court has already rejected as defaulted without cause or prejudice.

The Utah Supreme Court held that because the testimony had significant probative value to rebut Mr. Kell's claim that the attack was not racially motivated, it was highly relevant and not unduly prejudicial. *See id.* Mr. Kell makes no argument that this ruling contravened or unreasonably applied any Supreme Court precedent. Nor has he demonstrated by clear and convincing evidence that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented to it. *See* 28 U.S.C. § 2254(d)–(e). And to the extent he now argues that the Utah Supreme Court would have viewed the facts differently had it been aware of the impeachment evidence the State allegedly withheld, Mr. Kell's default of Claim Eleven precludes relief on that basis.

**Thirteen (F): Autopsy Photo of the Nevada Homicide Victim During the Penalty Phase**

During the penalty phase of Mr. Kell's trial, the prosecution offered a small close-up autopsy photograph of Mr. Kell's previous homicide victim to inform the jury of his history of committing brutal murders. *See Kell I*, 61 P.3d at 1032. The trial court admitted the photograph. On direct appeal, Mr. Kell argued that the trial court should not have admitted the photo because it was gruesome and presumptively inadmissible under Utah Rule of Evidence 403. The Utah Supreme Court concluded that, while disturbing, the photograph was not gruesome for purposes of Rule 403. *See id.* It did not show blood stains or gaping wounds, things that court had previously held can render a photo gruesome. *See State v. Decorso*, 993 P.2d 837, 849 (Utah 1999). The court also concluded that the photo was highly relevant to framing Mr. Kell's character before the jury in the penalty proceedings, explaining that in considering what sentence to recommend, a jury may "legitimately consider a defendant's character, future dangerousness, lack of remorse, and retribution." *Kell I*, 61 P.3d at 1032 (cleaned up). The court held that the photograph in this case showed "the violent and brutal manner in which [Mr. Kell] had killed an earlier victim" and that Mr. Kell's "willingness to commit extremely brutal and violent crimes was certainly a relevant factor for the jury to consider at sentencing." *Id.*

Mr. Kell now argues that the Utah Supreme Court's ruling is contrary to *Zant v. Stephens*, 462 U.S. 862 (1983), and *Romano v. Oklahoma*, 512 U.S. 1 (1994), which hold that a defendant's due process rights can be violated if the jury is permitted to consider evidence so unduly prejudicial as to render the trial fundamentally unfair.

As an initial matter, it does not appear that Mr. Kell ever made this constitutional argument to the Utah Supreme Court; his arguments there were based on state law alone. It

follows that he cannot now complain that the Utah Supreme Court misapplied federal precedent in deciding what was presented as a state-law claim.

Even if Mr. Kell had preserved this argument, however, it would not succeed. In *Romano*, the Court observed that it is possible for "admission of evidence" to "so infect[] the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." 512 U.S. at 12. Although the Utah Supreme Court did not cite *Romano*—or apparently consider federal due process at all—it nevertheless held that the photograph "was highly relevant to framing [Mr. Kell's] character" because it "show[ed] the violent and brutal manner in which [he] had killed an earlier victim." *Kell I.*, 61 P.3d at 1032. Mr. Kell has not argued, let alone shown, that this purpose was unconstitutional. And the fact that the court considered both the potential prejudice and the probative value of the photograph indicates that it essentially weighed the fairness of admitting it, even though it did not recite the *Romano* standard by name. Nor, of course, did the Utah Supreme Court misapply *Zant*, which held only that the jury may not consider evidence "totally irrelevant to the sentencing process." 462 U.S. at 885.

It follows that Mr. Kell has neither demonstrated that the Utah Supreme Court's decision was contrary to or a misapplication of clearly established U.S. Supreme Court precedent nor established by clear and convincing evidence that Utah Supreme Court's factual determinations were incorrect. *See* 28 U.S.C. § 2254(d)–(e). And to the extent Mr. Kell argues that the Utah Supreme Court misapplied its own precedents, this claim is not cognizable in a federal habeas action, in which the court can grant relief only for "violation[s] of the Constitution or laws or treaties *of the United States*." *Id.* § 2254(a) (emphasis added).

**Thirteen (G): Testimony of Geoffrey Swann During the Penalty Phase.**

During Mr. Kell's penalty phase, the State presented the testimony of Geoffrey Swann, a former member of security at the Nevada prison system and, at the time of the trial, an investigator for the Nevada Department of Corrections' Inspector General's Office. *See* Dkt. No. 94 at 73. Mr. Swann testified that he was familiar with Mr. Kell from Mr. Kell's time in the Nevada prison system. *See id.* at 74. He also testified that while Mr. Kell was in Nevada, he was affiliated with two white racist gangs. *See id.* at 73. Mr. Kell claims that in so testifying, Mr. Swann relied on reports of this affiliation that were prepared by prison officers other than Mr. Swann, which Mr. Swann neither brought to the trial nor provided Mr. Kell. *See id.* at 74–75. The defense did not object to Mr. Swann's testimony, however. *See* Dkt. No. 106 at 267.

On direct appeal, Mr. Kell contended that Mr. Swann's testimony regarding his affiliation with a white supremacist prison gang—which relied on reports that were themselves hearsay—denied him his right to confrontation and violated Utah law. The Utah Supreme Court held that the evidence was properly admitted because it "bore directly on the question of motive for Blackmon's killing, [Mr. Kell's] premeditated intent, and on [Mr. Kell's] character, a mandatory element to be considered during a capital sentencing proceeding." *Kell I*, 61 P.3d at 1033.

To the extent Mr. Kell argues that he was deprived of his constitutional right to confront the authors of the reports regarding his prior gang affiliations on which Mr. Swann relied at his sentencing proceeding, he has not identified any Supreme Court precedent that clearly establishes such a right. Indeed, the Supreme Court held in *Williams v. New York* that there is no constitutional right to confront witnesses during sentencing proceedings. *See* 337 U.S. 241, 245 (1949). To be sure, that case involved sentencing before a judge, not a jury, and it was decided before the Confrontation Clause had been applied to state proceedings. But in the absence of any Supreme Court case clearly establishing a right to confrontation during the sentencing phase

before a jury, *see Szabo v. Wells*, 313 F.3d 392, 398 (7th Cir. 2002), Mr. Kell has not demonstrated that the Utah Supreme Court's decision was contrary to or an unreasonable application of any federal law clearly established by the Supreme Court. And although Mr. Kell argues that the Utah Supreme Court incorrectly determined facts relating to the reliability of Mr. Swann's testimony, these factual findings, even if erroneous, are not relevant here because they do not relate to the potential violation of a clearly established constitutional right. *See Menzies v. Powell*, 52 F.4th 1178, 1195 (10th Cir. 2022).

**E.**

In Claim Nineteen, Mr. Kell argues that the trial court violated his Eighth and Fourteenth Amendment rights by refusing to instruct that the jury could consider sympathy or mercy in reaching its decision during the penalty phase and also violated his rights to due process, effective assistance of counsel, and a fair trial under the Sixth and Fourteenth Amendments by restricting defense counsel's *voir dire*.

The trial court denied Mr. Kell's request for an instruction that would have specifically identified mercy and sympathy as mitigating factors. The Utah Supreme Court affirmed, recognizing that Utah law "does not identify mercy or sympathy as mitigating factors." *Kell I*, 61 P.3d at 1034. The court noted that United States Supreme Court authority has previously rejected, on collateral review, the notion that mercy is a constitutionally required mitigating circumstance. *See id.* at 1034–35 (discussing *Saffle v. Parks*, 494 U.S. 484 (1990)). Mr. Kell has not shown that the Utah Supreme Court contradicted or unreasonably applied United States Supreme Court authority because he has pointed to no case that clearly establishes a right to an instruction identifying mercy and sympathy as mitigating factors.

In *Saffle*, the Supreme Court considered whether it violated the defendant's rights to instruct the jury that it "must avoid any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor when imposing sentence." 494 U.S. at 487. The Supreme Court acknowledged its precedent requiring that the jury be allowed to consider "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 489 (cleaned up). But it ultimately held that this precedent did not dictate that instructions to avoid any influence of sympathy, sentiment, passion, or prejudice violated the Constitution. *See id.* at 494. If the Supreme Court's precedent did not foreclose instructing the jury not to consider these factors—including sympathy—it certainly follows that it does not clearly establish that a jury must affirmatively be instructed that it may consider sympathy and mercy as mitigating factors.

Mr. Kell argues that the trial court could not constitutionally prohibit the jury from considering any mitigating evidence, and he insists that mercy and sympathy fall under that umbrella. But the court did not instruct the jury *not* to consider mercy; rather, it instructed the jury "to consider as mitigating circumstances any other factors concerning Mr. Kell that you find to be relevant." KIR 2357. Then, Mr. Kell's trial counsel, without objection from the State, specifically told the jury that "all life is worth saving, that mercy is the highest attribute that you can attain." He concluded: "I ask you—I plead with you—to temper justice with mercy and spare Troy Kell's life." XIV 5724. The State did not respond that the jury could not legally consider mercy. Rather, it responded that Mr. Kell did not deserve mercy. Even assuming that prohibiting the jury from considering mercy and sympathy during the sentencing phase would violate the Constitution, Mr. Kell thus fails to demonstrate any such prohibition in his case.

Mr. Kell also argues in passing that the trial court erred in not allowing him, during *voir dire*, to "ask venire members whether the decision on whether death is an appropriate punishment is one that must be made based on the jurors' individualized moral judgment," because it concluded that this question misstated the law. Dkt. No. 94 at 129. Although it does not appear that Mr. Kell presented this claim of error to the Utah Supreme Court, he also cites no Supreme Court cases that clearly establish his right to ask such a question, nor does he allege that his counsel was barred from asking any legally accurate questions about the jurors' sentiments regarding the death penalty during *voir dire*. He accordingly has not demonstrated entitlement to relief on this ground either.

**F.**

In Claim Twenty-five (C), Mr. Kell maintains that Utah's capital sentencing scheme violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution because it fails to narrow the class of defendants eligible for a death sentence. In particular, he contends that the aggravating factors that can support a conviction for aggravated murder and render a defendant eligible for the death penalty under Utah law are too numerous to provide any meaningful limit on the prosecutor's discretion in determining against whom to seek the death penalty.

The Utah Supreme Court, citing a long line of cases, observed that it had rejected such claims and concluded that Utah's death penalty regime is constitutional on numerous occasions, and it stated that it saw no reason to revisit the issue in Mr. Kell's case. *See Kell I*, 61 P.3d at 1036–37. Mr. Kell has not shown that the Utah Supreme Court contradicted or unreasonably applied controlling United States Supreme Court precedent.

The Supreme Court has made clear that state death penalty statutes must include an eligibility phase that narrows the class of death-eligible defendants. *See Tuilaepa v. California*, 512 U.S. 967, 971–72 (1994). One way a State may meet this requirement is to require the jury to find at least one aggravating circumstance that does not apply to every murderer and that is not unconstitutionally vague. *See id.* at 972.

Before it could recommend the death penalty, Mr. Kell's jury was required to find at least one aggravating circumstance that did not apply to every homicide. In this case, it found four: (1) killing while incarcerated, (2) killing while serving a life-without-parole sentence, (3) killing after already having been convicted of first-degree murder, and (4) committing an especially heinous, atrocious or cruel murder. *See* Dkt. No. 106-22.

Mr. Kell does not argue that these aggravators were deficient; instead, he maintains that Utah's aggravated murder statute contains so many aggravators that it effectively covers every murder—and thus fails, as a practical matter, to provide the constitutionally required "narrowing principle." *Maynard v. Cartwright*, 486 U.S. 356, 363 (1988). But he cites no Supreme Court authority that clearly establishes that there is an upper limit on the number of aggravating factors a State may recognize or that has invalidated a State's death-eligibility statute because it included too many aggravating factors and thus essentially covered every murder. Nor do any of the Supreme Court cases that have generally addressed this issue, such as *Maynard*, clearly imply that, if such a limit does exist, the subset of murders potentially covered by Utah's aggravated murder statute is too great a proportion of the total set of intentional killings.

The closest authority that does point in Mr. Kell's favor is the holding in *Maynard* that Oklahoma's then-existing "especially heinous, atrocious, or cruel" aggravator was unconstitutionally vague because "nothing in [those] few words, standing alone, . . . implies any

inherent restraint on the arbitrary and capricious infliction of the death sentence." 486 U.S. at 363–64. It could follow that if one of Utah's factors similarly provided no restraint on a prosecutor's discretion, then it would effectively fail in its purpose to limit the set of death-eligible murders.

This argument fails here, however, because Mr. Kell identifies no aggravator in Utah's regime that is unconstitutionally vague. Indeed, the "heinous, atrocious, or cruel" aggravator in Mr. Kell's case required the jury to find "physical torture, serious physical abuse, or serious bodily injury" of the victim before death, which the Utah Supreme Court has held requires "physical abuse or injury . . . qualitatively and quantitatively different and more culpable than that necessary to accomplish the murder." *Kell I*, 61 P.3d at 1036 (cleaned up). The Tenth Circuit has held that almost exactly the same statutory formulation in Oklahoma's law passes constitutional muster. *See Workman v. Mullin*, 342 F.3d 1100, 1115–16 (10th Cir. 2003). For all of these reasons, Mr. Kell has not demonstrated that the Utah Supreme Court contravened or unreasonably applied clearly established U.S. Supreme Court precedent in upholding Utah's death-eligibility regime.

**G.**

In Claim Twenty-five (F), Mr. Kell contends that it was unconstitutional for the state to present the jury with three overlapping aggravators—murder while incarcerated, murder by someone already convicted of murder, and murder while serving a life sentence. He maintains that these factors all focus on the same aggravating attribute—the fact that he had committed murder before—and that it therefore prejudiced him to present all three to the jury as factors it could consider during the penalty phase.

Mr. Kell's claim fails, however, because he cites only *Utah* Supreme Court cases that he claims this practice contravenes. Even assuming his reading of those cases is correct, federal habeas relief under the AEDPA is of course unavailable for the contradiction or misapplication of state court precedents. And to the extent Mr. Kell generally cites U.S. Supreme Court cases such as *Gregg v. Georgia*, 428 U.S. 153 (1976), these cases do not clearly establish that a jury cannot be presented with overlapping aggravating factors during the sentence phase of a capital trial. Rather, they require only that States "minimize the risk of wholly arbitrary and capricious action." *Id.* at 189. Without identifying any U.S. Supreme Court case that clearly supports his argument, Mr. Kell does not meet his burden under 28 U.S.C. § 2254(d) for this claim.

**H.**

In Claim Twenty-nine, Mr. Kell argues that it would violate his Eighth Amendment rights to execute him given the length of time he has been on death row. He identifies no U.S. Supreme Court case that clearly establishes a right to a timely execution, however, nor one that invalidated a death sentence based on excessive delay in carrying out the execution. It follows that he is not entitled to relief on this claim.

**I.**

Finally, in Claim Thirty-one, Mr. Kell maintains that the cumulative effect of all the errors he identifies deprived him of his right to a fair trial even if no error was individually so prejudicial as to have done so. But given the court's conclusion that Mr. Kell has not met the AEDPA standard in showing even one error with respect to any claim that this court may consider on the merits, however, he cannot prevail on an argument that the cumulative effect of multiple errors abridged his rights. *See Haddock*, 12 F.3d at 960.

## VI.

Under Rule 11(a) of the Rules Governing Habeas Corpus Cases under Section 2254, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

Under the AEDPA, a certificate of appealability may issue only if "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has said that the "substantial showing" standard "includes showing that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (cleaned up). When a district court rejects on the merits a petitioner's constitutional claims—which this court did with Claims One (A), (B), (D); Five; Six; Thirteen (C), (D), (E). (F), (G); Nineteen; and Twenty-five (C) and (F)—the requirement for satisfying Section 2253(c) is straightforward: "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*

Although it is a close question, the court concludes that two of Mr. Kell's claims may be debatable among reasonable jurists. The first is Claim One (A), (B), and (D), in which Mr. Kell maintains that holding the trial in a prison courtroom and under extra security unconstitutionally prejudiced the jury against him. The second is Claim Twenty-five (C), in which Mr. Kell argues that Utah's aggravated murder statute includes so many aggravating factors that, in effect, every murderer will be eligible for the death penalty. Although the court believes its rulings on these issues are correct given the demanding AEDPA standard and the lack of on-point, clearly established U.S. Supreme Court authority, these areas of the law do appear, at least, to be

unsettled, and there is at least some Supreme Court precedent that arguably tends to support Mr. Kell's claims. The court accordingly grants a certificate of appealability with respect to these two claims.

The court concludes that Mr. Kell has failed to make a substantial showing of the denial of a constitutional right with respect to the remainder of his claims. It accordingly denies a certificate of appealability with respect to all other claims.

* * *

For the foregoing reasons, Docket Number 94, Mr. Kell's Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, is **DENIED**. A certificate of appealability is **GRANTED** with respect to the issues presented in Claims One (A), (B), (D) and Twenty-five (C) and otherwise **DENIED**. Docket Number 337, Motion for Expedited Consideration, is **DENIED AS MOOT**.

**IT IS SO ORDERED**.

Dated this 21st day of August, 2026.

BY THE COURT:

Howard C. Nielson, Jr.
United States District Judge